Victor VELEZ, et al., Plaintiffs,

v.

QVC, INC., Defendant.

No. CIV.A. 00–5582.

United States District Court,
E.D. Pennsylvania.

Sept. 27, 2002.

As Modified Oct. 30, 2002.

William H. Ewing, Eckert Seamans Cherin & Mellott, LLC, Philadelphia, PA, Alan J. Rich, Baree N. Hassett, Law Offices of Alan J. Rich, New York City, Rachel Castillo Rosser, Eckert Seamans Cherin & Mellott, LLC, Philadelphia, PA, for Plaintiffs.

Jeffrey Ivan Pasek, Michele A. Ledo, Thomas C. Zielinski, H. Robert Fiebach, Sarah E. Davies, Christine A. Char, Cozen & O'Connor, Philadelphia, PA, for Defendant.

Charles M. Hart, Wolf, Block, Schorr and Solis–Cohen LLP, Philadelphia, PA, for Movant.

## MEMORANDUM

ROBRENO, District Judge.

### TABLE OF CONTENTS

I. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .394

II. DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .395
 A. Untimeliness Issues as to Plaintiffs Reynolds, Minott–Talley and Ramirez–Crane's Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .396
 1. Plaintiffs Reynolds, Minott–Talley and Ramirez–Crane's Title VII claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .396
 a. Continuing violations doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .397
 b. Single filing rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .399
 c. Emotional distress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .401
 2. Plaintiffs Reynolds, Minott–Talley and Ramirez–Crane's Section 1981 claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .403
 3. Plaintiff Ramirez–Crane's Equal Pay Act claim . . . . . . . . . . . . . . . . . . . . . .404
 4. Plaintiff Owens' Title VII sex discrimination claim . . . . . . . . . . . . . . . . . . .405

 B. Merits of Plaintiffs Velez, Owens and Tucker's Claims . . . . . . . . . . . . . . . . . . .405
 1. Applicable standard of proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .405
 a. Direct evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .406
 b. *McDonnell Douglas* indirect proof model . . . . . . . . . . . . . . . . . . . . . . . . .407
 2. Title VII, Section 1981, and PHRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .408
 a. Token hiring . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .408
 b. Hostile work environment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .409
 i. Nexus between different types of discrimination at QVC . . . . . . . .412

 ii. Plaintiff Velez's hostile work environment claim . . . . . . . . . . . . . . . 412
 iii. Plaintiff Owens' hostile work environment claim . . . . . . . . . . . . . . . 414
 iv. Plaintiff Tucker's hostile work environment claim . . . . . . . . . . . . . 414
 c. Retaliation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 415
 i. Plaintiff Velez's retaliation claim . . . . . . . . . . . . . . . . . . . . . . . . . . 416
 ii. Plaintiff Owens' retaliation claim . . . . . . . . . . . . . . . . . . . . . . . . . . 416
 iii. Plaintiff Tucker's retaliation claim . . . . . . . . . . . . . . . . . . . . . . . . . 417
 d. Disparate treatment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 418
 e. Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 419
 3. Equal Pay Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 420
 a. Plaintiff Owens' Equal Pay Act violation claim . . . . . . . . . . . . . . . . . . . 420
 b. Plaintiff Tucker's Equal Pay Act violation claim . . . . . . . . . . . . . . . . . . 421
 4. New York Statutory Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 421
 a. Plaintiff Velez's New York statutory claims . . . . . . . . . . . . . . . . . . . . . . 422
 b. Plaintiff Tucker's New York statutory claims . . . . . . . . . . . . . . . . . . . . . 422
 5. Plaintiff Tucker's fraud claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 422

 C. Outstanding Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 423

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 425

Plaintiff Victor Velez ("Velez") and five other former show hosts of defendant QVC, a telemarketing television network, have filed this putative class action against QVC for alleged discrimination based on race and sex. QVC conducts its business through the medium of nationally broadcast direct response television programming which is aired live twenty-four hours a day, seven days a week. As show hosts, plaintiffs appeared on the air for the purpose of marketing and selling the products sold by QVC.

The claims are based on federal civil rights law as well as the laws of New York and Pennsylvania. The case was initially filed as a class action. However, given the number of putative class representatives, the complexity of the claims asserted under the laws of various jurisdictions, which were applicable to some but not all plaintiffs, under the unusual circumstances of this case, and for case management purposes, the court deferred holding a hearing on class certification until merit discovery was concluded and the contours of each claim asserted by each plaintiff became more apparent. Following the filing of five amended complaints, completion of exhaustive and contentious discovery, and lengthy briefing by the parties, the legal issues implicated by the various claims are ripe for decision.

Presently before the court are defendant's motions for summary judgment. For the reasons that follow, summary judgment will be granted on all of the claims of plaintiffs Clarence Reynolds, Sophia Minott–Talley, and Daliza Ramirez–Crane, because the claims are time-barred. Summary judgment as to the claims of plaintiffs Velez, Owens and Tucker is granted in part and denied in part.

## I. BACKGROUND

Count I of the Fifth Amended Complaint[1] alleges a violation of Title VII of

1. This action was originally filed by plaintiff Victor Velez in the United States District Court for the Eastern District of New York on August 26, 1998, and raised a variety of claims against QVC relating to Velez's involuntary termination from QVC in November, 1997. This complaint was never served. However, subsequently, this original complaint has been amended multiple times to include additional plaintiffs and claims, and these amendments have been properly served. On July 28, 1999, QVC filed a motion to

the 1964 Civil Rights Act; 42 U.S.C. § 2000e, *et seq.*, for race and sex discrimination. First, plaintiffs maintain that those plaintiffs who are members of racial minorities were hired based on the discriminatory practice of "tokenism." Second, plaintiffs allege that the defendant practices discriminatory disparate treatment of racial minority hosts by relegating them to the "graveyard" shifts with no genuine hope of advancement. Third, plaintiffs assert that QVC maintains a hostile work environment with respect to racial minority and female employees. Fourth, plaintiffs maintain that their terminations were the result of discrimination. Lastly, plaintiffs allege that QVC retaliated against them for participating in protected activities under Title VII. In Count II, those plaintiffs asserting discrimination based on race also assert violations of § 1981 of the Civil Rights Act of 1866, based on the same allegations of race discrimination as mentioned in Count I.

In Counts III and IV, plaintiffs Velez and Tucker allege violations of New York Executive Law § 296 (New York State Human Rights Law ("NYSHRL")) and Administrative Code of the City of New York § 8–107 (New York City Civil Rights Law ("NYCCRL")). In Count V, plaintiffs Velez, Owens and Tucker allege violations of the Pennsylvania Human Relations Act, 43 Pa. Con. Stat. Ann. § 954(a) ("PHRA"). In Count XI, plaintiff Tucker asserts a fraud claim under Pennsylvania law arising from the final contract that she entered into with QVC in May, 1999. Finally, in Count XII, plaintiffs Owens, Tucker and Ramirez–Crane allege violations of the Equal Pay Act.[2]

Defendant maintains that it is entitled to summary judgment on all plaintiffs' claims because they are either untimely or raise no genuine issue of material fact.

## II. DISCUSSION [3]

For the sake of clarity, the discussion

---

dismiss and/or transfer the case to the Eastern District of Pennsylvania. In October 2000, the district court for the Eastern District of New York granted the motion and transferred the action to this court. On December 26, 2000, plaintiffs filed a Fifth Amended Complaint.

As alleged in plaintiffs' Fifth Amended Complaint, Plaintiff Victor Velez is a "dark-skinned person of Hispanic origin," and was hired by QVC's subsidiary, Q2, not a defendant in this case, on September 11, 1995. On April 8, 1996, Velez was terminated from his position at Q2 when it closed its operations and hired by QVC in West Chester, Pennsylvania. On November 25, 1997, Velez was terminated by QVC.

Plaintiff Gwen Owens is a "dark skinned African–American woman," who was employed by QVC from 1994 until 1998, when QVC terminated her.

Plaintiff Lynne Tucker, a white female employee of QVC, was hired on November 1, 1995. Tucker alleges that she suffered discrimination based on sex and was paid a smaller salary than other male hosts who were hired at the same time and had similar

experience as she did. At the time the Fifth Amended Complaint was filed, she was still an employee of QVC. She has since resigned.

Plaintiff Clarence Reynolds is a "dark-skinned person of African–American origin," who was employed at QVC from October 1989 to October 1993 when Reynolds voluntarily quit his job with the defendant.

Plaintiff Daliza Ramirez Crane is a "dark haired Hispanic woman" who was employed by QVC from December 1990 to June 1995 when she was terminated by QVC.

Plaintiff Sophia Minott–Talley is a "dark-skinned African–American woman," who was hired by QVC on July 27, 1994 and terminated in February 1995 at the end of her probationary training period.

**2.** The remainder of the claims alleged in the Fifth Amended Complaint were dismissed by order of the court on May 4, 2001. *See* Order, (doc. no. 30).

**3.** The standard of review is well-settled. Federal Rule of Civil Procedure 56(c) is designed

seriatim is divided into three parts. Part A will discuss the timeliness of plaintiffs' Reynolds, Minott–Talley and Ramirez–Crane's claims. Part B will discuss the substantive merits of plaintiffs Velez, Owens and Tucker's .claims. Part C will discuss plaintiffs' request for yet additional time to conduct discovery before they can adequately respond to defendant's motions for summary judgment.

A. *Untimeliness Issues as to Plaintiffs Reynold, Minott-Talley and Ra-mirez–Crane*

Defendant makes the following arguments with respect to the untimeliness of some of the plaintiffs' claims. First, the Title VII claims of plaintiffs Reynolds, Minott–Talley and Ramirez–Crane are time-barred for failure to exhaust administrative remedies. Second, the Section 1981 claims of plaintiffs Reynolds, Minott–Talley and Ramirez–Crane are barred by the two year statute of limitations. Third, plaintiff Ramirez–Crane's Equal Pay Act claim is barred by the applicable statute of limitations. Fourth, plaintiff Owens' sex discrimination claim is barred because her EEOC charge did not include an allegation of sex discrimination.

1. *Plaintiffs ·Reynolds, Minott–Talley and Ramirez-Crane's Title VII claims*

█ Before a lawsuit can be brought to assert claims under Title VII, a charge of discrimination must be filed with the EEOC within 300 days of the occurrence of the alleged discriminatory employment practice. 42 U.S.C. §§ 2000e–5(f) & 2000e–5(e); *EEOC v. Commercial Office Prods.*, 486 U.S. 107, 110, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 926 (3d Cir.1997) ("[F]ederal courts lack jurisdiction to hear a Title VII claim, unless the plaintiff has filed a charge with the EEOC."). The purpose of the EEOC filing requirement is twofold: one, to notify the charged party of the grievances against it, and, two, to encourage conciliation between the parties. *See Hicks v. ABT Assocs., Inc.*, 572 F.2d 960, 963 (3d Cir.1978). A violation which is not made the subject of an EEOC charge within the requisite time period is "the legal equivalent of a discriminatory act which occurred before the statute was passed" and is "merely an unfortunate event in history which has no present legal consequences." *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).

█ The timeliness of the charge is determined by the date that the statute of limitations begins to run, i.e., the date of the discriminatory act, not the time that the consequences of that act are realized. *Del. State Coll. v. Ricks*, 449 U.S. 250, 259, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980) ("[T]he limitations period commenced to run when the tenure decision was made and Ricks was notified."). An employee who is terminated or resigns must file

to secure a just, speedy and inexpensive determination of cases before they proceed to trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is proper when the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. .Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 250–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine only if the evidence is such that a reasonable jury could find for the non-moving party. *Id.* at 251, 106 S.Ct. 2505. In making this determination, a court must draw all reasonable inferences in favor of the non-movant. *See Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. denied*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984).

charges with the EEOC within 300 days of the resignation or termination, since their last date of employment is the last day on which the employee could have suffered an adverse employment action. *See Hipp v. Liberty National Life Ins. Co.*, 252 F.3d 1208, 1222 n. 12 (11th Cir.2001). Reynolds' last day of employment with QVC, the last day he could have suffered an adverse employment action, was November 12, 1993. He had until September 8, 1994 to file an EEOC charge. Minott–Talley was terminated on February 28, 1995; thus, she had to file an EEOC charge by December 25, 1995. Ramirez–Crane was terminated on June 1, 1995. She had to file a charge with the EEOC by March 27, 1996. Because plaintiffs Reynolds, Minott–Talley and Ramirez–Crane did not file charges with the EEOC within 300 days of their termination or resignations, their claims are barred.

■ Plaintiffs seek to breathe new life into their expired claims by arguing that the filing requirement of Title VII and the applicable statute of limitations of § 1981 should be tolled under: 1) the continuing violation doctrine, 2) the single filing rule, and/or 3) as a result of plaintiffs' severe emotional distress.[4] These arguments are unavailing.

a. *Continuing violations doctrine*

■ The continuing violations doctrine enables a plaintiff who files an EEOC complaint about a specific discriminatory act by his employer to reach back in time to prove other discriminatory acts that his employer committed against him, even if those acts occurred more than 300 days before the event of which he formally complained, *see West v. Philadelphia Elec. Co.*, 45 F.3d 744, 748 (3d Cir.1995), provided that he "can demonstrate that the act is part of an ongoing practice or pattern of discrimination of the defendant." *Id.* at 754; *see also Hipp*, 252 F.3d at 1221 (explaining that "claims of discrimination were not time-barred because some acts of discrimination against the individual plaintiffs had occurred within the statutory period, even though prior acts did not. The earlier acts of discrimination were actionable because they were part of a continuing violation").

As stated above, plaintiffs Reynolds, Minott–Talley and Ramirez–Crane did not file a claim within 300 days of the last act of discrimination alleged, i.e., the last day of their employment with defendant. Only Velez did so. Plaintiffs Reynolds, Minnott–Talley and Ramirez–Crane argue that the defendant continued the same type of alleged discriminatory pattern and practice against Velez for more than 300 days after the last adverse employment action against them had occurred. Therefore, plaintiffs Reynolds, Minnott–Talley and Ramirez–Crane contend that the timely filing by Velez with the EEOC revives their stale claims, because Velez's filing was based on the same pattern and practice of discrimination as that suffered by the plaintiffs.

■ This is not so. The law is clear that the continuing violation doctrine tolls the statutory filing period only where some aspect of the discriminatory violation as to *that plaintiff* continued into the statutory filing period. "To establish that a claim falls within the continuing violations theory, the plaintiff ... must demonstrate that at least one act occurred within the filing period: 'The crucial [sic] question is

---

4. The timely filing requirement is "not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equi-table tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982).

whether any *present* violation exists [as to that plaintiff].'" *West,* 45 F.3d at 754–55 (quoting *United Air Lines v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977)(emphasis in original)). Thus, the rule cannot apply to a Title VII claim that became stale before the first EEOC charge was filed by another plaintiff, even if it involves the same type of discriminatory conduct by the defendant. *See Miller v. Int'l Tel. & Tel. Corp.,* 755 F.2d 20, 25 (2d Cir.1985) ("[S]everal courts have held that an employee who has been discharged pursuant to a discriminatory policy may not take advantage of later discriminatory acts against other employees for the purpose of postponing the running of the statutory period as to him on a continuing violation theory."); *Hipp,* 252 F.3d at 1221 (finding "no authority ... for allowing one plaintiff to revive a stale claim simply because the allegedly discriminatory policy still exists and is being enforced against others"); *cf. Wetzel v. Liberty Mut. Ins. Co.,* 508 F.2d 239, 246 (3d Cir.1975) ("[C]ontinuing violations of Title VII ... allow a filing of a charge at any time by a present employee.").[5]

The rationale against allowing the revival of stale claims is sound. First, "[w]hen an employee is terminated, the employment relationship ends; and the fear of reprisal and the reasons for allowing employees to claim a continuing discriminatory policy are removed." *Hipp,* 252 F.3d at 1222 n. 12 (quoting *Gray v. Phillips Petroleum Co.,* 858 F.2d 610, 614 (10th Cir. 1988));[6] *Williams v. Owens–Illinois, Inc.,* 665 F.2d 918, 924 (9th Cir.1982)("A refusal to hire or a decision to fire an employee may place the victim out of reach of any further effect of company policy, so that such a complainant must file a charge within the requisite period after the refusal to hire or termination, or be time-barred."). Second, "if former employees were allowed to assert charges [outside the filing period], the purpose of the statute of limitations would be undermined and employers could be exposed to unlimited suits." *Hipp,* 252 F.3d at 1222 n. 12. Thus, when an employee has left his company, "he must comply with the charge-filing period, and the continuing violation doctrine will no longer save a late claim." *Id.*

Because the sole purpose of the continuing violations doctrine is to allow an indi-

---

**5.** In *Avagliano v. Sumitomo Shoji America, Inc.,* 103 F.R.D. 562 (S.D.N.Y.1984), a case similar to this one, plaintiffs sought class certification and alleged that defendant "by its policies engaged in a continuing pattern and practice of discrimination." *Id.* at 578. The plaintiffs argued that the continuing violations doctrine would allow the court to include as class members other employees who had left the employment of the defendant more than 300 days before the earliest date that any class representative filed a claim with the EEOC, and whose claims were otherwise stale. *See id.* Rejecting this theory, the court explained that "plaintiffs ... may not represent those who could not have filed charges during the applicable limitation period," and held that "those individuals who terminated their employment with [the defendant] prior to the 300-day cutoff may not join the class." *Id.*

**6.** By contrast, in cases where the courts have relied on the continuing violations doctrine, the plaintiffs have continued to be employed by the defendant. *See Cardenas v. Massey,* 269 F.3d 251, 257 (3d Cir.2001) (continuing violation doctrine applicable where plaintiff alleged ongoing failure to promote or increase wage level to one appropriate to his skills); *Rush v. Scott Specialty Gases, Inc.,* 113 F.3d 476, 482–83 (3d Cir.1997) (final events leading to hostile work environment claim occurred less than 300 days prior to filing of charge; plaintiff was employed by defendant up to 120 days prior to filing of charge); *Miller v. Beneficial Mgmt. Corp.,* 977 F.2d 834, 843–44 (3d Cir.1992) (pay discrimination is a continuing violation while plaintiff continues to receive paychecks).

vidual to rely on his own timely EEOC filing in order to introduce evidence of other discriminatory acts directed towards him outside the filing period, and not to permit that individual to salvage otherwise stale claims by reference to timely filings by others, the court concludes that Velez's EEOC charge did not resurrect the stale claims of plaintiffs Reynolds, Minott–Talley and Ramirez–Crane.

### b. Single filing rule [7]

■ Plaintiffs Reynolds, Minott–Talley and Ramirez–Crane also assert under the single filing rule that their claims are not time-barred based on the timely filed EEOC charge of plaintiffs Velez, Owens and Tucker.[8] Under the single filing rule, "if one plaintiff has filed a timely EEOC complaint as to that plaintiff's individual claim, then co-plaintiffs with individual claims arising out of similar discriminatory treatment in the same time frame need not have satisfied the filing requirement." *Allen v. U.S. Steel Corp.*, 665 F.2d 689, 695 (5th Cir.1982). Similarly, a plaintiff may bring a class action on behalf of those who have not filed charges with the EEOC, and thus toll the statute of limitations for all members of the class. *Wetzel,* 508 F.2d at 246.[9] While the complaints need not be identical, they must arise out

of similar discriminatory treatment in the same time frame, provided that they give the employer adequate notice and an opportunity for conciliation. *Snell v. Suffolk County,* 782 F.2d 1094, 1100 (2d Cir.1986).

■ However, as one court of appeals has stated:

> That filing, it seems clear, however, cannot revive claims which are no longer viable at the time of the filing. Any other result would produce an anomaly. Time-barred members could not press their claims individually either before the Commission or judicial tribunals; and surely the employer's liability to them cannot be made to depend upon whether they come into court in a different character. True it is that class actions are liberally permitted in the federal courts, but that procedural device cannot be used to expand substantive rights. Not surprisingly, then, courts which have considered the question directly have uniformly held that only those employees who could have filed charges with the Commission individually when the class filing was made are properly members of the litigating class.

*Laffey v. Northwest Airlines, Inc.,* 567 F.2d 429, 472 (D.C.Cir.1976) (citing *Wetzel,* 508 F.2d 239) (footnotes omitted).

7. Based on plaintiffs' response to defendant's motions, plaintiffs combine the continuing violation doctrine and the single filing rule in an attempt to save these three plaintiff's claims. However, under the case law as discussed herein, the two doctrines are separate grounds for equitable tolling. In any event, even if the two doctrines could be viewed in combination, the law is clear that neither can be used to revive a stale claim.

8. Tucker, however, did not assert a claim for race discrimination so her charge cannot serve as a basis for Reynolds, Minott–Talley and Ramirez–Crane's claims of race discrimination in any event.

9. The Third Circuit has limited the application of the single filing rule so that "a nonfiling plaintiff who intends to rely upon an EEOC charge already filed by another party must allege class based discrimination." *Communications Workers of America v. N.J. Dep't. of Pers.*, 282 F.3d 213, 217 (3d Cir. 2002); *see also Whalen v. W.R. Grace & Co.*, 56 F.3d 504, 507 (3d Cir.1995) ("There is no suggestion that filing a charge with allegations broad enough to support a subsequent class action lawsuit relieves the burden of filing the class action itself ....."). Here, while a class has not yet been certified, nonfiling plaintiffs have alleged class-based discrimination.

The last possible date on which discrimination occurred towards plaintiffs Reynolds, Minott–Talley and Ramirez–Crane are the dates that they ceased working for defendant. These dates are November 12, 1993, February 28, 1995, and June 1, 1995, respectively. The first timely-filed EEOC charge in this case was that of Victor Velez on December 11, 1997. The non-filing plaintiffs could not have filed a timely charge because by the time that Velez filed his claim, the statutory period during which Reynolds, Minott–Talley, and Ramirez–Crane were required to file their claims had expired.[10] Thus, the single filing rule does not save plaintiffs Reynolds, Minott–Talley and Ramirez–Crane's claims of discrimination under Title VII.

█ Plaintiffs make the additional argument that Minott–Talley and Ramirez–Crane should be permitted to piggyback on the EEOC charge of non-plaintiff Chuck Fields who filed a charge on March 6, 1995.[11] Plaintiffs argue that because the Fields charge was filed at a time when Minott–Talley and Ramirez–Crane's claims were still viable, and because the resulting lawsuit continued past December 11, 1997, when plaintiff Victor Velez filed his timely EEOC charge, Minott–Talley and Ra-

mirez–Crane should be allowed to rely on Fields' charge to cure the gap in time between the expiration of the 300 day statutory period during which they had to filed charges and the filing of the Velez charge. The court does not agree.

In the Third Circuit, "piggybacking [under the single filing rule] has never been allowed when the subsequent action is not a class action." *Communications Workers of America v. N.J. Dep't of Pers.*, 282 F.3d 213, 217 (3d Cir.2002);[12] *see also EEOC v. Air Line Pilots Ass'n*, 885 F.Supp. 289, 294 (D.D.C.1995) ("[T]he single filing rule applies only where at least one *plaintiff* in a lawsuit filed a timely EEOC charge.") (emphasis supplied); *Banas v. American Airlines*, 969 F.2d 477, 483 (7th Cir.1992) ("[An] ... EEOC charge can be relied upon by a plaintiff who did not actually file the charge *but upon whose behalf* the charge was filed.") (emphasis supplied); *Romasanta v. United Airlines, Inc.*, 537 F.2d 915, 918 (7th Cir.1976) ("[Class] members may rely on the champion of the class until he or she abdicates.").

█ Therefore, "outside the context of a representative or class action, ... an individual plaintiff must file a timely administrative charge." *Whalen v. W.R.*

---

**10.** As noted above, Reynolds, who left QVC on November 12, 1993, had to file an EEOC charge by September 8, 1994. Minott–Talley, who was terminated on February 29, 1995 had to file an EEOC charge by December 25, 1995. Ramirez–Crane, terminated on June 1, 1995, had until March 27, 1996 to file an EEOC charge.

**11.** Fields was employed with QVC from November 1, 1992 to January 25, 1995, and filed a charge on March 6, 1995. Fields subsequently brought an action in the United States District Court for the Eastern District of Pennsylvania, which was subsequently dismissed with prejudice.

**12.** To the extent that *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446 (11th Cir.

1993), on which the plaintiffs rely, allows piggybacking under the single filing rule in the absence of a class action, it is contrary to the law of this circuit. Even if it was not contrary, however, *Calloway* still does not save the claims of plaintiffs Minott–Talley and Ramirez–Crane. The Eleventh Circuit held that a plaintiff "who *unsuccessfully moves to intervene* in the lawsuit of a plaintiff who has filed an EEOC charge may invoke the single filing rule ...." *Id.* at 450 (emphasis supplied). There is no evidence that Minott–Talley or Ramirez–Crane ever sought to intervene in the lawsuit that Fields filed in the wake of his EEOC charge, or to link their claims to his in any way until long after his suit had been dismissed with prejudice.

*Grace & Co.*, 56 F.3d 504, 505 (3d Cir. 1995). A contrary rule "would allow a would-be plaintiff who missed the statutory time limit for filing an EEOC charge to file an independent lawsuit by relying upon the timely charge of some other individual, even though the individual is not named in the lawsuit," *Air Line Pilots Ass'n*, 885 F.Supp. at 293, and thus "circumvent the well-settled principle 'that a party seeking relief under Title VII must file timely charges of employment discrimination with the EEOC before that party may seek judicial relief.'" *Id.* Since Fields' claim was not a representative or a class action, Minott–Talley and Ramirez–Crane may not piggyback on his complaint.[13]

#### c. *Emotional distress*

■ Plaintiffs also argue that Reynolds, Minott–Talley and Ramirez–Crane suffer from post-traumatic stress disorders that disabled them from pursuing legal action as a consequence of their conditions. Under these circumstances, plaintiffs argue that the period for filing an EEOC charge as to these plaintiffs is equitably tolled for the entire time during which they suffered emotional distress. The court does not agree.

■ "[T]here is no absolute rule that would require tolling whenever there is mental disability. The federal courts 'have taken a uniformly narrow view of equitable exceptions to Title VII limitations periods.'" *Lopez v. Citibank, N.A.*, 808 F.2d 905, 906 (1st Cir.1987). "[M]ental illness tolls a statute of limitations only if the illness *in fact* prevents the sufferer from managing his affairs and thus from understanding his legal rights and acting upon them." *Miller v. Runyon*, 77 F.3d 189, 191 (7th Cir.1996) (not allowing tolling because plaintiff attended university for two semesters during filing period).

■ In this case, plaintiffs Reynolds, Minott–Talley, and Ramirez–Crane have not demonstrated that they were unable to manage their own affairs or understand their legal rights within the 300 days that each had to file an EEOC charge after experiencing an adverse employment action. Plaintiffs' designated expert psychia-

---

**13.** Plaintiffs attempt to use Field's filing to close the gap between the expiration of the time during which they were required to file a charge (300 days after their last days of employment) and the filing of the Velez charge. As set forth in the text, a plaintiff whose own claim has expired cannot piggyback on the timely charge of another individual if that individual does not file a representative or class action lawsuit. *See Communications Workers*, 282 F.3d at 217. That principle equally bars plaintiff's argument here, and plaintiffs have produced no authority to the contrary.

Moreover, even if Fields were considered a class representative, a plaintiff who fails to file a timely EEOC charge may not take advantage of the single filing rule where the filing plaintiff "did not abdicate at a point where the suit had gone far enough to affect the rights of other class members." *Wakeen v. Hoffman House, Inc.*, 724 F.2d 1238, 1246 (7th Cir.1983); *cf. Romasanta*, 537 F.2d at 918–19 (allowing class members to take advantage of timely filings by class representatives who decided not to appeal an adverse class action determination because "to hold otherwise would permit one member of the class to obtain benefits greater than other members.").

The Fields lawsuit was dismissed with prejudice for neglect to prosecute. Because the court did not consider the truth or falsity of the allegations in the underlying complaint, it made no decision that could affect Minott–Talley or Ramirez–Crane. Accordingly, neither Minott–Talley nor Ramirez–Crane may rely on the Fields filing to satisfy their own filing requirements. *Cf. Wakeen*, 724 F.2d at 1246 (refusing to allow a class member to rely on the timely filing of a class representative who "was involuntarily eliminated [on grounds of res judicata] before the court made any determinations on the merits of the class claims.").

trist, Ari Kiev, M.D., submitted an affidavit reaching the conclusion that all six plaintiffs, including Reynolds, Minott–Talley, and Ramirez–Crane, suffer from post-traumatic stress disorder as a result of their experiences at QVC. While this may be so, the conditions allegedly suffered by the plaintiffs do not equitably toll a statute of limitations where it is otherwise demonstrated that during the relevant time, such plaintiff was capable of managing his or her own affairs.

Illustrative is *Powell v. Independence Blue Cross, Inc.*, No. 95–2509, 1997 WL 137198 (E.D.Pa. Mar. 25, 1997), where the court found that the plaintiff had not demonstrated that he was unable to manage his own affairs, despite doctor's testimony that the plaintiff's condition rendered him incapable of making a decision about how to proceed on his claim of discrimination, and despite the fact that the plaintiff had been a patient in a mental health outpatient day treatment program. *Id.* at *2–3, *5. In *Powell*, the court found that plaintiff discussed his legal rights with an attorney, cared for himself and his son, read and played computer games, and handled household accounts, *id.* at *6, and concluded that, "[a]ssuming that mental incapacitation is an 'extraordinary' reason which would justify tolling a federal limitations period, plaintiff has not presented evidence sufficient to satisfy the test for such incapacitation recognized or employed by any court." *Id.; see also Speiser v. U.S. Dep't of Health and Hum. Servs.*, 670 F.Supp. 380, 383–84 (D.D.C.1984) (despite doctor's testimony about plaintiff's depression and hospitalizations, plaintiff did not submit sufficient evidence that she could not handle her affairs or comprehend her legal rights).

In addition, the courts have not permitted tolling based on alleged mental incapacity where a plaintiff has consulted with or been represented by an attorney. *See Hood v. Sears Roebuck and Co.*, 168 F.3d 231, 233 (5th Cir.1999) (plaintiff's retaining counsel during filing period demonstrates an ability to manage own affairs); *Lopez*, 808 F.2d at 907 (where plaintiff was represented by counsel during charge-filing period, no strong reason why plaintiff was unable to bring suit); *Temparali v. Rubin*, No. 96–5382, 1997 WL 361019, at *5 (E.D. Pa. June 19, 1997) (plaintiff could not show inability to manage own affairs or pursue a legal claim where she consulted an attorney about paternity, custody and support issues).

No plaintiff here has provided sufficient evidence to show that he or she could not manage his or her own affairs or comprehend his or her legal rights. Plaintiff Clarence Reynolds testified that he suffered from depression for an eight-month period of time following his resignation on November 23, 1993, the same date that his EEOC filing period began to run. During this period, despite the mental incapacity that he claims prevented him from filing a timely EEOC charge, Reynolds found employment as a disc jockey about a month after leaving QVC, and eight months after that became employed as a show host by Home Shopping Network, and later became executive producer of a joint venture between Home Shopping Network and Black Entertainment Television, where he remained for two years. Additionally, he sought no medical assistance from a physician or psychologist during the filing period.

Similarly, plaintiff Minott–Talley has not provided evidence that she was unable to manage her affairs or understand her legal rights. Minott–Talley testified that following her departure from QVC, she moved to New York in order to pursue a career in affiliate marketing, began working for a nonprofit organization, and over the course

of the next few years, held a variety of jobs in New York City. In addition, while she did seek medical treatment for back pain she experienced after her termination by QVC, she sought no psychiatric or psychological treatment. Further, she consulted with her cousin, an attorney, on matters unrelated to her experiences at QVC.

Plaintiff Ramirez–Crane has also failed to show that she was unable to manage her affairs or understand her legal rights. After Ramirez–Crane's departure from QVC, she was re-employed on a temporary basis, spent five months as a permanent executive assistant, and within a year after she left QVC was employed by Global Shopping Network as an on-air host. Furthermore, she was enrolled in a Ph.D. program at Temple University during her QVC employment, and has remained enrolled until the present. In addition, approximately six months after her termination, she consulted a lawyer to discuss the issue of the non-compete clause in her QVC contract.

Plaintiffs rely on *Llewellyn v. Celanese Corp.*, 693 F.Supp. 369 (W.D.N.C.1988) in support of their emotional distress claims. There, as a result of over thirty acts of discrimination over three years, plaintiff suffered from severe anxiety and depression for which she was placed on various combinations and dosages of psychotropic medications; she also developed what appeared to be a seizure disorder. *Id.* at 375. As a result, the court found that:

> The combined effect of her depression and the medications rendered plaintiff unable to attend to everyday activities such as washing dishes, cleaning her home, and caring for her children. Her

parents took her children to buy food. Her children cleaned the house. She spent most of her time sleeping. When she awoke she had trouble walking down the hall of her trailer to the kitchen. She experienced a lump in her throat, had difficulty eating, would frequently vomit what she had eaten, and had chronic diarrhea.

*Id.* Plaintiffs have presented no evidence representing the type of incapacitation at issue in *Llewellyn*.[14] Indeed, in stark contrast, each of the plaintiffs in the present case quickly obtained other employment and remained able to discuss issues concerning their affairs with attorneys.[15] Thus, the court finds that all have failed to provide sufficient evidence to raise a genuine issue of material fact as to whether they were unable to manage their affairs or understand their legal rights or make decisions in matters of importance to such an extent to toll the statute of limitations.

### 2. Plaintiffs Reynolds, Minott–Talley and Ramirez-Crane's Section 1981 claims

Title 42 U.S.C. § 1981 does not set forth an express statute of limitations. To fill this void, the United States Supreme Court has directed courts to locate the "most appropriate or analogous state statute of limitations." *Goodman v. Lukens Steel*, 482 U.S. 656, 660, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). Specifically, the Court has held that the Pennsylvania two-year statute of limitations for personal injury applies to a § 1981 action relating to an employment discrimination claim in

---

**14.** Furthermore, the court in *Llewellyn* first found that tolling was also justified because defendants failed to post the legally required notices of Title VII rights. *Id.* at 378.

**15.** Although plaintiff Minott–Talley did not discuss the issues in this case with her cousin, an attorney, the contact shows that she had access to an attorney with whom she discussed matters of importance.

403

Pennsylvania.[16] *Id.* at 661–62, 107 S.Ct. 2617.

■ Although the continuing violation doctrine applies to § 1981 claims, and tolls the statute of limitations where a defendant has engaged in continued alleged discriminatory conduct, *see Anjelino v. N.Y. Times Co.*, 200 F.3d 73, 97–98 (3d Cir.1999), for the same reasons stated in connection with plaintiffs' Title VII claims, *see supra* Part II.A.1.a., the doctrine is not applicable here either. Plaintiff Reynolds resigned from QVC on November 12, 1993; his § 1981 limitations period ended on November 12, 1995. Plaintiff Minott–Talley was terminated on February 28, 1995; her § 1981 limitations period ended on February 28, 1997. Plaintiff Ramirez–Crane was terminated on June 1, 1995; her § 1981 limitations period ended on June 1, 1997. However, the original complaint filed in this action (on behalf of Victor Velez) was filed on August 28, 1998, after the statute of limitations had expired as to each of these three plaintiffs. Because the employment of these three plaintiffs ended more than two years prior to the filing of any complaint in this matter, the court finds that plaintiffs Reynolds, Minott–Talley and Ramirez–Crane's § 1981 claims are untimely.

### 3. *Plaintiff Ramirez–Crane's Equal Pay Act claim*

■ In Count XII of the Fifth Amended Complaint, plaintiff Ramirez–Crane asserts a violation of the Equal Pay Act ("EPA"). Under the Equal Pay Act, a claim must be brought within two years after a violation or three years after an alleged willful violation. 29 U.S.C. § 255(a). Thus, in order to have filed a timely EPA claim, Ramirez–Crane was required to file her complaint, at the latest, within three years from the date that she alleges the last violation occurred.

■ The continuing violation doctrine applies to Equal Pay Act claims, but only to the extent that plaintiff continued to be paid. *See Miller v. Beneficial Mgmt. Corp.*, 977 F.2d 834, 843–44 (3d Cir.1992) (pay discrimination is a continuing violation while plaintiff continues to receive paychecks). Therefore, any claim by Ramirez–Crane under the Equal Pay Act was required to be brought, at the latest, before June 1, 1998, three years after her termination from QVC or the date she received her last paycheck from QVC.[17] No claims were filed on Crane's behalf, and no EPA claim was asserted on behalf of any plaintiff until January 1999. Thus, the court finds that plaintiff Ramirez–Crane's EPA claim is similarly time-barred.[18]

16. On the basis of a dissent by Judge Alito in *Zubi v. AT&T Corp.*, 219 F.3d 220 (3d Cir. 2000), plaintiffs argue that 28 U.S.C. § 1658, which supplies a four-year uniform statute of limitations for causes of action arising under federal statutes enacted after December 1, 1990, governs their § 1981 claims, since Congress amended § 1981 after that time. However, the Third Circuit's 2–1 majority opinion in *Zubi*, which concluded that Congress did not intend for the new, uniform statute of limitations to apply where preexisting case law had already established a clear statute of limitations, *see id.* at 223, and that § 1658 does not apply where Congress merely amends preexisting law, *id.* at 225, is controlling authority.

17. Although Ramirez–Crane does not state with particularity the date that she received her last paycheck from defendant, given that she was terminated on June 1, the court finds that there is no reasonably probability that she continued to receive paychecks from defendant through January of the following year.

18. Plaintiffs make a general argument that Reynolds, Minott–Talley and Ramirez–Crane's claims should not be dismissed as time-barred because QVC has been on notice of these claims since the early stage of this litigation. (The earliest event to occur in this litigation was plaintiff Velez's EEOC charge on December 11, 1997). Plaintiffs argue that in follow-

### 4. Plaintiff Owens' Title VII sex discrimination claim

■ Defendant argues that plaintiff Owens' claim for sex discrimination in Counts I and V are barred because her EEOC charge did not include allegations of sex discrimination. When a complaint contains a claim not presented to the appropriate administrative agency, the Third Circuit requires courts to determine "whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." *Antol v. Perry,* 82 F.3d 1291, 1295 (3d Cir.1996).

Plaintiff Owens was terminated on November 12, 1998 and filed a charge of *race* discrimination on December 22, 1998. However, on February 11, 1999, Owens filed an amended charge of discrimination with the EEOC, alleging sex discrimination. Since this amended charge was filed within the applicable 300 day period, Owens' claims of sex discrimination survive.

For the reasons set forth above, the court will grant defendant's motion for summary judgment with respect to plaintiffs Reynolds, Minott–Talley and Ramirez–Crane as time-barred, and deny the motion with respect to plaintiff Owens.

### B. Merits of Plaintiffs Velez, Owens and Tucker's Claims

The three remaining plaintiffs assert the following claims. Plaintiff Velez asserts claims under Title VII, 42 U.S.C. § 1981, Pennsylvania Human Relations Act, New York State Human Rights Act, and New York City Civil Rights Act, alleging (1) token hiring, (2) hostile work environment, (3) disparate treatment, (4) termination, and (5) retaliation. Plaintiff Owens asserts claims under Title VII, 42 U.S.C. § 1981, and Pennsylvania Human Relations Act, alleging (1) hostile work environment, (2) disparate treatment, (3) termination, and (4) retaliation. Plaintiff Tucker asserts claims under Title VII, Pennsylvania Human Relations Act, New York State Human Rights Act, and New York City Civil Rights Act, alleging (1) hostile work environment and (2) retaliation. Plaintiffs Owens and Tucker also assert claims under the Equal Pay Act, and plaintiff Tucker asserts a fraud claim arising from the renegotiating of her employment contract of April/May 1999.

### 1. Applicable standard of proof

The United States Supreme Court has recognized three models for proving intentional discrimination: (1) direct evidence cases as described in *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985) and *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); (2) indirect evidence cases based on an alleged pattern or practice of discrimination, as described in *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); and

---

ing this notice and opportunity to conciliate, defendant conducted extensive discovery. More specifically, the defendant vigorously litigated this matter against these plaintiffs through motions practice, propounding and receiving responses to multiple interrogatory and document requests, conducting lengthy depositions of these plaintiffs, conducting protracted psychiatric and psychological exams of these plaintiffs, and utilizing multiple experts that have reviewed and submitted opinions on a host of issues regarding these plaintiffs, including their performances, schedules and salaries. Defendant, therefore, has been given and taken advantage of every opportunity to litigate and defend against these plaintiffs.

However, this argument is irrelevant because plaintiffs make no assertion that defendant waived these statute of limitations arguments or are somehow estopped from asserting them now. ·

(3) indirect evidence cases based on the paradigm described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The court concludes that only the *McDonnell Douglas* indirect evidence paradigm is available to plaintiffs.[19]

### a. *Direct evidence*

In direct evidence cases, the employee alleging discrimination must produce "direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. 1775; *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1097 (3d Cir. 1995). If the employee does produce direct evidence of discriminatory animus, the employer must then produce evidence sufficient to show that it would have made the same decision if the illegal bias had played no role in the employment decision. *Price Waterhouse*, 490 U.S. at 244–45, 109 S.Ct. 1775; *Starceski*, 54 F.3d at 1096. In order to shift the burden, the plaintiff must produce evidence that is "so revealing of discriminatory animus that it is not necessary to rely upon any presumption from the prima facie case . . . ." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 778 (3d Cir.1994).

"Stray remarks in the workplace, statements by nondecisionmakers, or even statements by decisionmakers unrelated to the decisional process itself, do not constitute direct evidence of discrimination." *Fakete v. Aetna, Inc.*, 152 F.Supp.2d 722, 733 (E.D.Pa.2001) (citing *Starceski*, 54 F.3d at 1096); *see also Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1111–12 (3d Cir.1997) (statement made by plaintiff's superior that "if you are getting too old for the job, maybe you should hire one or two young bankers" not direct evidence of age discrimination); *Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 545 (3d Cir.1992) ("Stray remarks by non-decisionmakers or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision.").

Plaintiffs proffer as direct evidence of discriminatory employment practices the following alleged incidents.

1. A statement by Vice President of Television Sales, Jack Comstock, to host Lisa Mason about plaintiff Velez in which he stated, "Lisa, we did what we had to do to get a minority face on the air. You can understand that, can't you? . . . But he's not earning $80,000 any more is he Lisa?" Plaintiff's Mem. Opp. Summ. J. at 97–98.

2. A statement by show host Dan Hughes at a host meeting: "[w]hy don't we all paint our faces black and sue the company . . . and make some money." Plaintiffs allege that Comstock, who was presiding over the meeting, laughed at this comment and never condemned it. Furthermore, plaintiffs contend that QVO Vice President Rob Cadigan and QVC President Doug Briggs did nothing to investigate the situation when made aware of it. *Id.* at 98–99.

3. An alleged comment by Hughes to fellow host plaintiff Ramirez–Crane in which he asked, "what's black and white and smells?—a Puerto Rican." *Id.* at 99.

---

**19.** Plaintiffs represented at oral argument that they did not intend to proceed under the *Int'l Bhd. of Teamsters* model of indirect proof, which provides for the use of statistical evidence, rather than individualized proof, to establish a *prima facie* case of discrimination. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 337–38, 359–60, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

4. An alleged comment from Briggs, before he became QVC president, to minority show host Chuck Fields, after a meeting in which Briggs and Fields had a disagreement about product placement on the overnight shifts, and Briggs passed Fields in the hallway and muttered to Fields, "little nigger." *Id.*

5. An alleged comment by Comstock, when seeing Fields with a hat on, "why are you wearing your hat that way, I thought all you guys wore your hats backwards." *Id.* at 100.

Because two of these five statements were not made by decisionmakers and all five are unrelated to the decision making process implicated in this case, none of the comments are direct evidence of discrimination. Two of the comments were made by fellow host Dan Hughes who had no impact on any of plaintiffs' salary, termination or hiring decisions. Two statements were allegedly made by Jack Comstock, who supervises the show hosts. However, none of Comstock's statements were made in the process of any employment decision. *See Fakete*, 152 F.Supp.2d 722, 734 (E.D.Pa.2001) (statement by plaintiff's supervisor that defendant's management was looking for "younger single people who would work unlimited hours" not direct evidence of age discrimination because not related to process of a particular employment decision). Lastly, the plaintiffs have not shown that the statement by Briggs, even if he was a decisionmaker at the time, impacted Field's employment in any way, or was linked to any employment decision concerning any plaintiff in this case. *See Eiland v. Trinity*

*Hosp.*, 150 F.3d 747, 749, 751 (7th Cir. 1998) (doctor's use of word "nigger," and act of showing newspaper articles portraying African Americans in a negative way to the plaintiff not direct evidence of race discrimination but rather stray workplace remark); *Clark v. Hess Trucking Co.*, 879 F.Supp. 524, 528, 530 (W.D.Pa.1995) (allegations that Vice President of Finance called plaintiff a "black nigger," told him to shut his "black mouth up" and do what she told his "black ass to do" not direct evidence of race discrimination because no proof that statements were connected in any way to decision to fire plaintiff).

Because plaintiffs have failed to produce direct evidence of discrimination, they may not proceed under the direct proof model.[20]

### b. *McDonnell Douglas Indirect Proof Model*

Plaintiffs may show the existence of intentional discrimination based on indirect evidence under the burden-shifting paradigm established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). This three-part model is applicable to statutory claims of racial discrimination under Section 1981, Title VII, and the PHRA,[21] when plaintiffs' claims are not based on direct evidence of discrimination. The plaintiffs carry the initial burden of establishing a *prima facie* case of unlawful discrimination. *Id.* at 802, 93 S.Ct. 1817. This may be done by showing that plaintiff is: (1) a member of a protected class; (2) qualified for the position; (3) suffered an adverse employment action; and (4) non-

---

20. However, some of these comments may be admissible for plaintiffs to meet their burdens under the indirect proof model. The court makes no rulings at this time on the admissibility of this evidence at trial.

21. Plaintiffs Velez, Owens and Tucker have asserted claims under the Pennsylvania Human Relations Act. 42 Pa. Con. Stat. Ann. § 954(a) ("PHRA"). Courts interpret the PHRA consistent with Title VII. *E.g., LaRose v. Philadelphia Newspapers, Inc.*, 21 F.Supp.2d 492, 497 (E.D.Pa.1998).

members of the protected class were treated more favorably. *See Ezold v. Wolf, Block, Schorr and Solis-Cohen,* 983 F.2d 509, 522 (3d Cir.1992) (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817).

Once the plaintiff is able to show a *prima facie* case, the employer has the burden to articulate some "legitimate, non-discriminatory reason for the employee's rejection." *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If the defendant states a legitimate, non-discriminatory reason for the adverse employment action, the employer satisfies its burden of production and the presumption of discrimination drops off the case. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Plaintiff then must meet his burden of persuasion by proving that the defendant's proffered reason is not the true reason for its decision, but instead is merely a pretext for racial discrimination. *See Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994). To meet this burden of persuasion, the plaintiff must produce "evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's actions." *Id.* "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Comty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

The *McDonnell Douglas* paradigm is applicable to this case.

#### 2. *Title VII, Section 1981, and PHRA*

##### a. *Token hiring*

■■ Plaintiffs Velez and Owens maintain that the only reason that they were hired by defendant was to have minorities on the staff as show hosts—*i.e.,* defendant discriminated against Velez and Owens by practicing "token" hiring. Under this theory, defendant hired plaintiffs as "minorities" with the intent to relegate them to less favorable conditions than non-minority employees and thereby preclude their career advancement.

Defendant responds that the plaintiffs cannot meet their *prima facie* burden as to token hiring because the hiring of plaintiffs alone does not constitute an adverse employment action. *Cf. Cline v. Bala Nursing & Ret. Ctr.,* Civ. A. No. 97–5262, 1998 WL 136524, at *3 (E.D.Pa. Mar. 19, 1998) ("[P]laintiff must show that she suffered an adverse employment action, whether in the form of a termination or lack of promotion or otherwise, because she was [a member of a protected class]."). The court agrees. The mere act of being *hired* as a "token" alone does not constitute an adverse employment action.[22]

■ Plaintiffs also argue that their token hiring claims are a version of unlawful "channeling." "Channeling" arises in circumstances where members of a protected class are hired for lower-paying jobs with fewer opportunities for advancement than others outside the protected class. *See, e.g., Carpenter v. Stephen F. Austin State*

---

**22.** Defendant relies on *Manning v. Southwestern Bell Mobile Sys.,* Civ. A. No. 90–6838, 1992 WL 170552 (N.D.Ill. July 15, 1992), where the court explained that "Title VII does not provide a cause of action for tokenism for the beneficiary of that tokenism." *Id.* at *5.

Plaintiffs attempt to distinguish *Manning* because in that case the court discussed tokenism in the context of pretext. However, the analysis that there is no cause of action for tokenism is instructive.

*Univ.*, 706 F.2d 608 (5th Cir.1983) (channeling claim arising out of initial placement of minorities and women at low paying clerical and custodial positions); *Sandoval v. Saticoy Lemon Ass'n*, 747 F.Supp. 1373 (C.D.Cal.1990) (channeling claim arising from classification of certain, lower paying jobs as "women's jobs"). Plaintiffs state that defendant's conduct in this case of hiring minorities and permanently "channeling" them into the overnight shifts constitutes "channeling after the fact."

Defendant argues that this is not a "channeling" case because minorities and non-minorities are hired for the same exact job—show hosts—and the only alleged channeling is the alleged placements on different shifts, the subject of plaintiffs' disparate treatment claims. Furthermore, plaintiffs admit that this so-called "channeling" does not occur at the hiring stage, but rather after the expiration of the six-month probation period for all new hires. Thus, according to defendant, plaintiffs' claims cannot be deemed to be a discriminatory hiring claim because the actions supporting the claims are alleged to have taken place after the completion of the six month training period and not at the time of hiring. The court agrees.

Assuming that tokenism plus "channeling" racial minorities and women into particular low level positions constitute illegal employment discrimination, plaintiffs mischaracterize their claim in this case. The "channeling" or discriminatory job assignment of "token" minorities, as to which they complain, did not occur until six months after plaintiffs had been hired. Therefore, because plaintiffs cannot show an adverse employment action in connection with their hiring, plaintiffs failed to make out a prima facie case of discrimination in hiring. Rather, to the extent that plaintiffs' token hiring and channeling claims are part and parcel of their dispa-

rate treatment claims, *i.e.*, at the time that the plaintiffs were hired, defendant intended that they would be slotted for the graveyard shift after six months of sham probation, evidence of tokenism and channeling may be asserted, if appropriate, to support those disparate treatment claims.

### b. *Hostile work environment*

In order to prove a hostile work environment under Title VII, a plaintiff must show that: (1) he or she suffered intentional discrimination because of his or her membership in the protected class; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would have detrimentally affected a reasonable person of the same protected class in that position; and, (5) the existence of respondeat superior liability. *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 753 (3d Cir.1995) (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir.1990)). For purposes of a hostile work environment within this framework, the discrimination complained of must be "pervasive and severe enough 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Saidu–Kamara v. Parkway Corp.*, 155 F.Supp.2d 436, 439 (E.D.Pa. 2001). (quoting *Meritor Savings Bank FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). Defendant QVC contends that each plaintiff in this case has failed to establish, as a matter of law, that the discrimination complained of was pervasive and regular.

In determining whether a plaintiff has made the requisite showing of hostile work environment, a court must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or a mere offensive

utterance; and whether it reasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Thus, "allegations of isolated or single incidents of harassment do not constitute a cognizable hostile work environment claim." *Saidu–Kamara,* 155 F.Supp.2d at 439 (citing *Rush v. Scott Specialty Gases, Inc.,* 113 F.3d 476, 482 (3d Cir.1997)); *see also Drinkwater v. Union Carbide Corp.,* 904 F.2d 853, 863 (3d Cir.1990) ("Hostile environment harassment claims must demonstrate a continuous period of harassment, and two comments do not create an atmosphere.").

At the same time, however, "[u]nder the 'totality of circumstances' approach, a 'district court should not carve the work environment into a series of discrete incidents and then measure the harm according to each episode.'" *Jackson v. Quanex Corp.,* 191 F.3d 647, 660 (6th Cir.1999). As the Third Circuit has colorfully described it, "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and, similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1484 (3d Cir.1990). Disaggregating claims undercuts the totality of circumstances inquiry, because it "robs the incidents of their cumulative effect, and '[o]f course, when the complaints are broken into their component parts, each claim is more easily dismissed.'" *Jackson,* 191 F.3d at 660.

██ Accordingly, "incidents involving employees other than [a] plaintiff are relevant in establishing a generally hostile work environment." *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1416 (10th Cir. 1987); *see also West,* 45 F.3d at 757 ("[E]vidence of harassment of other workers, because they were African American,

was relevant to an examination of [plaintiff's] claims that he, too was harassed."); *Hall v. Gus Constr. Co.,* 842 F.2d 1010, 1014 (8th Cir.1988) ("We ... reject [the] contention that the district court erroneously considered all of the [three female plaintiffs'] claims together in determining that the [sexual] harassment was sufficiently pervasive and severe to constitute a violation of Title VII."). Indeed, as here, "[s]uch evidence could be critical to a plaintiff's case, for a claim of harassment cannot be established without a showing of more than isolated indicia of a discriminatory environment." *Vinson v. Taylor,* 753 F.2d 141, 146 n. 40 (D.C.Cir.1985).

That a plaintiff may rely upon incidents involving other employees to show the presence of a hostile work environment does not mean that the plaintiff can claim to have been victimized by each discriminatory act ever perpetrated by the employer in the workplace. Rather, a plaintiff relying upon the employer's past discriminatory conduct towards other employees must show that he or she was aware of the incidents during his or her term of employment, and that, under the circumstances of the case, there is a nexus between the discrimination directed at him or her, and that directed at others.

First, the plaintiff must show subjective awareness of the discrimination directed at others. The court must be able to assess whether the discrimination claimed, in fact, detrimentally affected the plaintiff. *See Andrews,* 895 F.2d at 1482; *see also Schwapp v. Town of Avon,* 118 F.3d 106, 111 (2d Cir.1997) ("[Plaintiff's] awareness that a supervisor ... told [other] officers to target minorities ... could very well be relevant to [plaintiff's] reasonable perception of a hostile work environment."); *Jones v. Flagship Int'l,* 793 F.2d 714, 721 n. 7 (5th Cir.1986) (Evidence of sexually

harassing incidents reported by other female employees "does not bear on [plaintiff's] individual claim of sexual harassment in the absence of evidence that such incidents affected [plaintiff's] psychological well-being").

■ The plaintiff, however, need not have witnessed the incidents involving other employees. Hearing about them, even second hand, is sufficient to make a plaintiff aware of the nature of the environment in which he works. *See West,* 45 F.3d at 757 (concluding that it was error to exclude evidence of plaintiff's employer's harassment of other African Americans, not witnessed by the plaintiff, because such evidence was "relevant to an examination of [plaintiff's] claims that he, too, was harassed"); *see also Schwapp,* 118 F.3d at 111 ("[T]he fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment").[23]

Secondly, a plaintiff must show a nexus between the discrimination directed at him or her and that directed at others. The relevant inquiry is "[w]hether ... in light of ... incidents [directed at other employees], the incidents [that the plaintiff] experienced more directly 'would reasonably be perceived and [were] perceived, as hostile or abusive....' " *Schwapp,* 118 F.3d at 112 (emphasizing that summary judgment may be inappropriate, because this inquiry involves factual issues best resolved by the

trier of fact). Under this approach the court retains the flexibility to evaluate complex employment environments, like QVC, where ostensibly "different" types of discrimination may actually be inextricably linked. For example, an employer who discriminates against some on the basis of national origin, others on the basis of race, and a third group on the basis of gender, may really be discriminating against anyone who is not a white male. *See Rauh v. Coyne,* 744 F.Supp. 1181, 1183 (D.D.C. 1990). Therefore, under certain circumstances, considering the claims of all three groups as separate and distinct from each other would fail to yield a comprehensive picture of a common environment that might be hostile to members of different protected classes for equally impermissible reasons.

In this case, Velez alleges that QVC discriminated against him on the basis of national origin, Owen alleges a combination of race and gender discrimination, and Tucker alleges gender discrimination only. All three claim that they were aware of the discrimination directed at each other and at other employees during their term of employment. The defendant contends that it is entitled to summary judgment in its favor, because, even assuming that the incidents complained of by plaintiffs are true, they do not, as a matter of law, constitute harassment severe and pervasive enough to rise to the level of hostile work environment.[24] Thus, the issue be-

**23.** Defendant QVC argues that any statements by plaintiffs Velez, Owens and Tucker concerning stories that others told them about allegedly discriminatory acts on the part of QVC would constitute inadmissible hearsay. This is not so. So long as a statement is being introduced to show the state of mind of the recipient of the information, and not for the truth of its content, it does not fall within the definition of hearsay. *See* Fed.R.Evid. 801(c); *see also West,* 45 F.3d at 751 (plaintiff's testimony as to a racial incident which

he did not witness but of which he and others soon learned, was "intended to provide the jury with information concerning how reports of the incident affected him," as well as to establish that his employer knew of the alleged hostile work environment). Thus, QVC's hearsay argument is without merit.

**24.** Defendant also claims that Velez has failed to meet his showing on the other four prongs of the hostile work environment inquiry, and, similarly, that Owens has failed to show that

fore the court is whether, under the circumstances of this case, defendant has demonstrated that it is entitled to judgment as a matter of law on plaintiffs' hostile work environment claims. *See* Fed. R.Civ.P. 56(c). The court will analyze each claim seriatim.

### i. *Nexus between different types of alleged discrimination at QVC*

▮▮▮▮ As noted above, a plaintiff alleging hostile work environment bears the burden of proving that the alleged discrimination would detrimentally affect a reasonable person of the same protected class in that position that the alleged discrimination detrimentally affected him. *See Andrews*, 895 F.2d at 1482. The question is "[w]hether ... in light of ... incidents [directed at other employees as members of the same or other protected classes], the incidents [that the plaintiff] experienced more directly 'would reasonably be perceived and [were] perceived, as hostile or abusive....' " *Schwapp*, 118 F.3d at 112.

▮▮▮ Whether an inference of discrimination is appropriate under the circumstances may depend on factors such as: (1) whether the discriminatory acts directed at others were undertaken by the same decisionmaker who is alleged to have discriminated against plaintiff, (2) whether the acts directed at plaintiff and those directed at other employees occurred in close temporal proximity, and (3) whether the type of discrimination complained of by plaintiff and that directed at other employees is similar in nature or kind. In other words, could a reasonable jury conclude that under the circumstances the discrimi-

nation of which the plaintiff complains is sufficiently similar in time, nature, and kind to that suffered by other employees to disclose the perpetrator's signature.

In this case, the court concludes that a trier of fact could so find as to these plaintiffs. *See Schwapp*, 118 F.3d at 112 (whether incidents relating to other minorities occurring during plaintiff's tenure were reasonably perceived as hostile or abusive should be resolved by trier of fact). One, most of the allegations emanate from conduct by a common alleged perpetrator and decisionmaker, Jack Comstock. Two, the incidents complained of by each plaintiff and those directed at co-plaintiffs and other employees occurred during roughly the same time during which all plaintiffs were employed by defendant. Three, most of the incidents complained of involve Comstock's common practice of belittling or bullying employee targets.[25] While the nature and kind of the alleged offensive conduct varied in degree from incident to incident and from employee to employee, the court concludes that a jury could find that the type of discrimination aimed at all of these plaintiffs and at other employees shares in common the sting of humiliation. Accordingly, each plaintiff shall be permitted to rely upon incidents aimed at co-plaintiffs and other employees that share these three common characteristics, and that involve other employees in showing the existence of a hostile work environment.

### ii. *Plaintiff Velez's hostile work environment claim*

Velez's claim consists of the following incidents that were directed at him and

---

her race or sex motivated the treatment of which she complains. Applying the summary judgment standard, the court finds that these assertions are without merit. Therefore, as stated above, the issue before the court is whether the defendant has demonstrated that the incidents complained of by plaintiffs are not, as a matter of law, pervasive and regular

enough to rise to the level of a hostile work environment.

**25.** For example, Owens and Tucker have both referred to Comstock's practice of nitpicking and critiquing to the point where both were reduced to tears.

allegedly occurred over a seventeen month period: (1) a comment made by another show host in Velez's presence to the effect that all Hispanics eat tacos or enchiladas "or something to that effect"; [26] (2) Velez's assignment to assist on a project about products being sold in Mexico because he was the only person that spoke Spanish; (3) QVC's lightening of Velez's publicity photograph in a way that made Velez appear white.

 Additionally, to show that he was subjectively aware of discriminatory incidents directed at other employees, of whom some were minorities and some were women, during his year and a half at QVC, Velez offers this additional evidence:

(1) Velez was aware that "minority hosts [including Dave King, Leah Williams and fellow plaintiff Gwen Owens] were also predominantly staying with that [overnight] time frame" and that that Owens was assigned "[a]lmost exclusively" to overnights.

(2) Velez pointed out conversations that he had with Owens, Williams and King where the four discussed the fact that

QVC had apparently lightened their publicity photographs so that all appeared to be white; Velez testified that everyone, including Owens appeared to be "about the same [lighter] color."

(3) Velez testified that female hosts Owens, Tucker and Lisa Mason told him about being bullied by Comstock.

(4) Velez testified that he recalled Comstock's demeaning and ridiculing Owens, that he saw her close to tears.

(5) Velez testified that female host Lisa Mason told him that Comstock had been "somewhat belligerent with her ... that he attempted on occasion to exert his authority by raising his voice." [27]

Thus, Velez's claim of discrimination on the basis of national origin appears to show three incidents that he personally experienced, and awareness of at very least nine other incidents of a similar kind and nature directed at five other minority and female employees during the year and a half that he worked at QVC. Viewing the totality of circumstances, the court finds that plaintiff Velez has produced sufficient

---

**26.** In *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), the Supreme Court permitting an employer facing a hostile work environment claim to show, as an affirmative defense, that it ("exercised reasonable care to prevent and correct promptly any ... harassing behavior, and ... that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise"). Defendant QVC has chosen not to raise this affirmative defense, at least at the summary judgment stage. *See* Reply Brief of Def. QVC in Support of Its Mot. for Summ. J. with Respect to the Claims Asserted by Pl. Victor Velez at 9 ("Plaintiffs imply that QVC, in its summary judgment motions, rely (sic) upon the affirmative defense ... created ... in *Burlington Indus*.... Contrary to Plaintiffs' assertion, QVC has not as yet asserted any such defense ...."). Instead, QVC argues only that Velez has failed to establish that its

allegedly offensive conduct was severe or pervasive. *Id.*

**27.** Although Velez testified that he heard about statements being made at a host meeting by "Dan Hughes with Jack Comstock [QVC Vice–President] in relation, to the effect of announcing the lawsuit and Dan Hughes making a statement, something to the effect, we should put on a black face and sue, and there was laughter among everybody, including Mr. Comstock," because this incident occurred when Velez was no longer employed by defendant, it cannot be considered for purposes of determining whether QVC was a hostile work environment for Velez. *See Wanchik v. Great Lakes Health Plan, Inc.*, 6 Fed.Appx. 252, 262, 2001 WL 223742, at *7 (6th Cir.2001) (episodes of harassment concerning other women is probative of hostile work environment only if plaintiff was aware of such episodes during her employment).

evidence, which, if believed by a jury, would show that defendant's conduct was pervasive and regular.

### iii. Plaintiff Owens' hostile work environment claim

 Owens asserts that the work environment at QVC was "uncomfortable," including "nitpicking and critiquing" and intimidation of show hosts. She maintains that during review meetings with Jack Comstock, QVC's Vice–President, she was critiqued in a manner that would bring her to tears. Standing alone, these allegations are not severe enough to make out a hostile work environment claim. See Preston v. Bell Atl. Network Servs., Inc., No. 96–3107, 1997 WL 20853, at *7–8 (E.D.Pa. Jan. 16, 1997) (statements that plaintiff was a "black son-of-a-bitch," that "there are a couple more [blacks] in here I would like to shoot," and "black day in Bedrock" not severe enough to create a workplace "permeated with discriminatory intent, ridicule, and insult") (citations and quotations omitted).

However, Owens also asserts that she was aware of the following incidents directed at women and other minorities:

(1) Owens testified that two other female hosts had contentious meetings and encounters with Jack Comstock.

(2) Owens testified that host Mary Beth Roe told her that Roe was being harassed over not wanting to travel, and "led [Owens] to believe that she was harassed and intimidated to the point that she was sick over it" by giving Owens examples of her experiences with Comstock.

(3) Owens testified that African American host Renee Ellison, ultimately terminated by QVC, was told not to wear her hair "slicked back" because "it looked too ethnic" and was trained by a QVC employee with no television on-air experience.

(4) Owens testified that she knew QVC's negative treatment of minorities Renee Ellison, Velez, Ramirez–Crane, and Minott–Talley.

Although, as noted above, the incidents that Owens experienced personally, standing alone, would not make out a hostile work environment claim, in this case she has introduced sufficient evidence of subjective awareness of at least eight other incidents of alleged discrimination involving eight other minorities and women during her employment at QVC. Viewing the totality of circumstances, the court finds that plaintiff Owens has produced sufficient evidence, which, if believed by a jury, would show that the defendant's conduct was pervasive and regular.

### iv. Plaintiff Tucker's hostile work environment claim

Tucker alleges the following incidents spread over the course of the four years that she worked at QVC: (1) that Comstock called her at home to harass her about her failure to sign her contract renewal for May 1999 which reduced her salary,[28] (2) that when she finally signed the amendment reducing her salary, Comstock seemed to relish in his victory, (3) that on a different occasion, after a meeting between Comstock, Tucker and anoth-

---

**28.** Tucker also cites to other incidents of creating a hostile work environment which did not occur during her employment and there is no evidence that Tucker learned of these incidents during her employment. These incidents cannot support Tucker's claim of hostile work environment. See Wanchik v. Great

Lakes Health Plan, Inc., 6 Fed.Appx. 252, 262, 2001 WL 223742, at *7 (6th Cir.2001) (episodes of harassment concerning other women is probative of hostile work environment only if plaintiff was aware of such episodes during her employment).

er male supervisor regarding Tucker's concerns with a technical director, Comstock said, "Well, I think we've all aired our grievances here, so why don't we just have a group hug," and thus made Tucker feel that Comstock discredited her opinion and demeaned her with "something he never would have said to a male host," and (4) that Comstock made her cry on many occasions, including during approximately half of her 17 bonus reviews because he "tends to talk down to people when he's trying to convey a message."

Tucker's claim also asserts that she was aware of the following incidents involving other employees:

(1) Tucker testified that she witnessed Owens in tears, which Tucker attributed to Owens' having had an unpleasant encounter with Jack Comstock.

(2) Tucker testified that she was aware that salary reductions were required only of female employees.

(3) Tucker alleged that Comstock wielded authority abusively and browbeated women.[29]

(4) Tucker testified to one incident where she and another female co-host came out of a meeting with Jack Comstock, and the other female host said "high five," apparently referring to the fact that this was a rare meeting that had not contained bullying or intimidation.

Standing alone, the incidents that Tucker experienced personally would not make out a hostile work environment claim environment. However, viewing the totality of circumstances, the court finds that plaintiff

Tucker has produced sufficient evidence, which, if believed by a jury, would show that the defendant's conduct was pervasive and regular.

Given that the plaintiffs have produced sufficient evidence, which, if believed by a jury, would show that defendant's conduct was pervasive and regular, the defendant's motion for summary judgment on plaintiffs' hostile work environment claims is denied.

### c. *Retaliation*

■■■■■ Title VII makes it unlawful for an employer to discriminate against an employee "because [the employee] has opposed any practice made an unlawful practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a). To establish discriminatory retaliation, a plaintiff must demonstrate that: (1) he engaged in an activity protected by Title VII; (2) the employer took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action. *See Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir.1995) (citing *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 201 (3d Cir.1994)). An adverse employment action, other than discharge or refusal to hire, "is … proscribed by Title VII only if it alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportu-

---

**29.** These generalized statements are generally insufficient to create a genuine issue of material fact. *See, e.g., Adeniji v. Admin. for Child. Servs.*, 43 F.Supp.2d 407, 423 (S.D.N.Y.1999) ("It is well settled that a plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn …. Accordingly, a Title VII plaintiff cannot defeat a motion for summary judgment by offering purely conclusory allegations of discrimination.") (quotations omitted).

nities, or adversely affect[s] his [or her] status as an employee." *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1300 (3d Cir.1997) (citations and quotations omitted).

#### i. *Plaintiff Velez's retaliation claim*

 Velez has failed to produce any evidence that QVC took an adverse employment action against him based upon his participation in any protected activity during the time when he was employed by QVC. The only alleged protected activity in which Velez engaged, *i.e.,* the filing of an EEOC charge and the filing of the instant complaint, occurred in December 1997 and August 1998, respectively, *after* he was terminated in November, 1997. Because Velez did not engage in protected activity during the time when he was employed by defendant, Velez has not made out a *prima facie* case of retaliation.[30] The defendant is entitled to summary judgment on Velez's claim of retaliation.

#### ii. *Plaintiff Owens' retaliation claim*

 Owens claims[31] that she was denied an anchor position at CN8 as a result of this litigation against QVC. CN8 and QVC are affiliated companies. Comcast is the parent company of both. Owens claims that after she was terminated by QVC, she became an evening news anchor for Tri–State Media, which was subsequently bought by Comcast in early 2000.

At that point, Comcast used Tri–State Media's news operation as a launching point for its own news operation, CN8. While at Tri–State Media, Owens interviewed for an anchor position with CN8. After Tri–State Media left the air, Mike Doyle, then-head of CN8, held an open meeting with the Tri–State news staff where he stated, "when people think of CN8 News, I want them to think of Gwen Owens, I want them to see this credible anchor, see someone knowledgeable, polished and friendly— someone they'll want to turn on to give them the news of the day." According to Owens, when she left that meeting, she felt as though she had secured the job and others had told her that they felt similarly. Shortly thereafter, Owens interviewed for the anchor position with what was essentially the CN8 "transition committee." After seeing that Owens was a former QVC host, one interviewer asked Owens about her QVC experience. Owens responded initially that it was a positive experience, but that during the last fourteen months, it was pretty terrible, and "to be honest, I'm currently in litigation with them." She then told the interviewers about her pending claims that QVC had discriminated against her.

Many weeks later, the two anchor positions were filled by others, not Owens. In turn, Owens was offered the job of reporter. When Comcast acquired Tri–State

---

**30.** At oral argument, plaintiffs' counsel made some reference to Mr. Velez's being turned down after second or third interviews as he looked for new work at new companies after his termination from QVC. Apparently, plaintiffs' counsel would have the court infer from the mere fact that new employers contacted Comstock that the reason that Velez had difficulty securing new employment was that Comstock had given him bad recommendations as retaliation. Whereas bad recommendations could indeed constitute a form of retaliation, the plaintiffs have offered no direct or indirect evidence that would allow the court to raise such an inference in this case. Therefore, summary judgment in favor of QVC is appropriate on this claim.

**31.** Defendant maintains that the court should *not consider* this claim of retaliation because it was not asserted in the Fifth Amended Complaint. To the extent that Owens failed to include the following allegations in her complaint, the defendant was on notice, and Owens is granted leave to amend her complaint under Fed.R.Civ.P. 15(a).

Media, Owens was earning $62,500 per year for a part time job as an anchor working four hours a day. In the new reporter's job, CN8 offered Owens the same salary for a full-time job that she earned working part time. When Owens brought this disparity to management's attention, according to Owens, she was told that the reporter position was a "take it or leave it proposition." Owens thus accepted the new full time job for the same pay that she received in the part time job. About six months later, one of the anchor positions became vacant and CN8 began interviewing for the position. Although Owens was interviewed, she claims that this time she was not seriously considered for the position by management. Owens is still employed as a reporter on the CN8 News, and is also a back-up anchor and substitutes from time to time for the full time anchors.

Owens claims that CN8's refusal to hire her for the anchor position was motivated by her litigation against QVC, a CN8 affiliate, and that senior management at QVC influenced the decision by CN8 not to hire her as an anchor at CN8.

Defendant admits that when the "transition committee" at CN8 was told of the litigation between Owens and QVC, one of the interviewers called Mike Doyle, now-President of the Eastern Division of Comcast, to seek his guidance as to how to handle the information relayed by Owens. Doyle then called Al Peddrick, Comcast's Senior Vice President of Human Resources, to seek his advice on the matter. In turn, Peddrick called Tom Clardy, QVC's Vice–President of Human Relations, to verify the information he had received from Doyle, and Clardy did confirm the fact that Owens was in litigation

with QVC. According to defendant, Peddrick then informed Doyle that the litigation should have no bearing on anything that was happening with Gwen Owens at CN8. Doyle then relayed this information to David Shane, one of the members of the hiring committee. In addition, Comcast's General Counsel Stanley Wang discussed the matter with QVC General Counsel Neil Grabell regarding this case. Defendant argues that there is nothing nefarious about the actions taken by CN8, Comcast and QVC personnel with respect to Gwen Owens and there is no evidence that QVC improperly influenced CN8's decision not to hire Owens as an anchorperson.

Upon review of the record viewed in the light most favorable to plaintiff Owens, based on Doyle's statement at the open meeting and the admission by defendant that Owens' hiring at CN8 was the subject of extensive discussions between CN8 and QVC senior management, and given the close temporal nexus between these events, a reasonable jury could conclude that QVC management adversely influenced CN8's decision not to offer Ms. Owens the position of anchor because of Owens' litigation against QVC. Therefore, the court concludes that summary judgment on this claim against plaintiff and in favor of defendant is not appropriate.[32]

iii. *Plaintiff Tucker's retaliation claim*

■ In support of her retaliation claim, Tucker asserts that, shortly after she attended Comstock's deposition in this case, Comstock stood by the television cameras during her next on-the-air shift and stared at her for 30 second and then left. Tucker testified that Comstock had never done that before. Tucker generally maintains

---

**32.** Earlier in the litigation, Owens made two additional claims for retaliation. However, plaintiff does not assert those grounds in its opposition to defendant's motion for summary judgment. Thus, any other ground for retaliation should be dismissed.

that after she joined this litigation, Comstock intentionally tried to intimidate her.

■■■■ The Third Circuit has held that an adverse employment action for retaliation must be "materially adverse" and rise to the level of a substantive violation of Title VII. *See Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300–1301 (3d Cir. 1997). These allegations, even if true, do not amount to an "adverse employment action" as required for a retaliation claim, because it did not directly affect the "terms and conditions" of her employment. *See Kidd v. Pennsylvania*, No. 97–5577, 1999 WL 391496, at *7 (E.D.Pa. May 20, 1999) (several derogatory comments after filing of complaint, pointing gun at plaintiff, and allegations of illicit conduct by plaintiff do not amount to changes in terms and conditions of plaintiff's employment and, therefore, do not constitute retaliation). Although intimidation in some contexts may rise to the level of "materially adverse employment action," the court finds that plaintiff Tucker's allegations of retaliation, even if true, do not establish a prima facie case that she was subjected to an adverse employment action that modified the terms and conditions of her employment. Accordingly, defendant is entitled to summary judgment on plaintiff Tucker's claim of retaliation.[33]

d. *Disparate treatment*

■■■■ In order to recover on a disparate treatment claim, a plaintiff must demonstrate that she was "singled out and treated less favorably then others similarly situated on the basis of an impermissible criterion under Title VII." *EEOC v. Metal Serv. Co.*, 892 F.2d 341, 347 (3d Cir.1990). Plaintiffs Velez and Owens allege that they were relegated to the overnight shift as a result of racial discrimination. Plaintiffs acknowledge that all new hires begin in the overnight shift and, after a six month probationary period, are rotated out into daytime shifts. The overnight shifts have the smallest audience and, thus, generate the smallest amount of sales revenue. Because promotion is based, in part, on a hosts sales results, assignment to the overnight shift for minority employees precluded career advancement. Velez and Owens have asserted that they were never rotated out of the overnight shifts for any extended length of time while working at QVC in West Chester.

■■■■ Viewing the evidence in the light most favorable to the plaintiffs, the court finds that plaintiffs have established that they are members of a protected class, that they are qualified for the day time assignments, that they suffered an adverse employment action, or that non-members of the protected class were treated more favorably. *See* Part II.B.1.b. (recognizing the availability of the *McDonnell Douglas* indirect proof model to this case). Defendant counters that the day time assignments were based on skills, and that plaintiffs were not as skilled as others assigned to the day time shifts. Under the circumstances, the court concludes that there are issues of fact as to whether the defendant's stated reasons for the job assignment are the true reasons, or merely a pretext for discrimination. Thus, defendant's motion for summary judgment on Velez and Ow-

**33.** An adverse employment action may exist in a retaliation claim if an employee can show that she was constructively discharged. *See Jones v. Sch. Dist. of Philadelphia*, 19 F.Supp.2d 414, 419 (E.D.Pa.1998). However, a court's determination of whether constructive discharge exists is objective; "it only exists when the employment environment is intolerable so that a reasonable person would have resigned." *Kidd*, 1999 WL 391496, at *8. Although Tucker has not raised this claim here, the court finds that the conduct alleged by Tucker cannot be realistically characterized as reasonably "intolerable."

ens' disparate treatment claims with respect to shift assignment will be denied.[34]

### e. *Termination*

▮▮▮▮▮ Plaintiffs Velez and Owens also allege that their employment with defendant was terminated based on their race. Plaintiffs claim that they were as qualified as non-members of the protected class whose contracts were renewed. The court finds that, viewing the evidence in the light most favorable to the plaintiffs, the plaintiffs have satisfied their prima facie burden by showing that plaintiffs, as members of a protected class, who were qualified as host or hostess, were treated differently than non-members with respect to contract renewal. Defendant has offered as a non-discriminatory reason that Velez and Owens' performances were unsatisfactory. The court finds that there are genuine issues of material fact as to whether defendant's proffered legitimate, non-discriminatory reasons for the adverse employment actions were pretextual. Thus, defendant's motion for summary judgment on plaintiff Velez and Owen's claims of discriminatory termination will be denied.[35]

---

**34.** At oral argument, the defendant underscored that this case is controlled by the Third Circuit's decision in *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509 (3d Cir. 1992). *Ezold* involved a claim by a female law firm associate who was denied admission to the partnership and who alleged that the decision to deny her admission was based on her gender. *Id.* at 512. The law firm contended that the associate was denied admission to the partnership because her legal skills did not meet the law firm's standard. *Id.* The defendant in this case analogizes to *Ezold*, and argues that, at least as it relates to the plaintiffs' disparate treatment claim, the decision to place the plaintiffs in the "graveyard" shift, and ultimately to terminate them was based on the employer's judgment that the plaintiffs, like the plaintiff in *Ezold*, did not meet the employer's quality standards.

After a bench trial, the district court concluded that the plaintiff in *Ezold* had established that the defendant's reasons for denying her partnership admission was pretextual. *Id.* at 513. In support, the district court pointed to male associates who had been admitted to the partnership, even though their evaluations showed that their skills were substantially the same or inferior to those of the plaintiff. *Id.* The Third Circuit reversed, holding "not only that the district court analyzed evidence improperly and that its resulting finding of pretext [was] clearly erroneous, but also that the evidence, properly analyzed, is insufficient to support that finding and therefore its ultimate conclusion of discrimination cannot stand." *Id.*

*Ezold* is distinguishable. *Ezold* involved a review of the sufficiency of the evidence after trial. This case is at the summary judgment stage, and, thus, all well-pleaded allegations must be accepted as true, and all favorable reasonable inferences must be drawn in favor of the plaintiffs. Under this standard, the court cannot conclude that the defendant has demonstrated the absence of a genuine issue of material fact as to whether its stated reason was or was not a pretext for discrimination. While *Ezold* may well set forth the legal standard to be applied in this case, given the existence of genuine issues of material fact, the issue of whether the stated nondiscriminatory reason was, under the circumstances, a pretext for discrimination is to be decided by the jury, and not by the court. *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994).

**35.** In support of his claim of discriminatory termination, plaintiff Velez has offered a taped recording of a conversation between himself and Jack Comstock in which Comstock made suggestions to Velez regarding what he should tell his viewers about his departure from QVC in order that his viewers not learn of the fact that Velez had been terminated. The court finds that the content of this tape is only relevant to Velez's claim of discriminatory termination which, in any event, raises genuine issue of material fact and which will proceed to trial.

Although defendant has questioned the admissibility of the tape based on the Pennsylvania statute banning surreptitious recordings, 18 Pa. Con. Stat. Ann. § 5703, as well as the plaintiff's untimely production of the tape, given that a ruling is not necessary to decide the summary judgment motions, the court will deny the motion without prejudice. De-

### 3. *Equal Pay Act*

The Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1) (the "EPA"), states:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

29 U.S.C. § 206(d)(1).

 Claims brought under the EPA follow a two-step burden shifting paradigm. The plaintiff must first establish a *prima facie* case by demonstrating that employees of the opposite sex were paid differently for performing equal work, which is "work of substantially equal skill, effort and responsibility, under similar working conditions." *Stanziale v. Jargowsky*, 200 F.3d 101, 107 (3d Cir.2000) (citing *EEOC v. Del. Dep't of Health & Soc. Svcs.*, 865 F.2d 1408, 1413–14 (3d Cir.1989)). If the plaintiff meets this test, the burden of persuasion then shifts to the employer to demonstrate the applicability of one of four affirmative defenses to pay discrepancies, namely (1) a seniority system; (2) a merit system; (3) a system which measures

earnings by quantity or quality of production; or (4) a differential based on any other factor other than sex. *Id.* at 107 n. 6. "Because the employer bears the burden of proof at trial, in order to prevail at the summary judgment stage, the employer must prove at least one affirmative defense 'so clearly that no rational jury could find (sic) to the contrary.' " *Id.* (quoting *EEOC v. Del. Dep't of Health & Soc. Svcs.*, 865 F.2d at 1414).

#### a. *Plaintiff Owens' Equal Pay Act violation claim*

 Owens' claim of a violation of the Equal Pay Act is based on a comparison of her starting salary and resulting increases with that of a male show host hired two months prior to Owens, Rick Domeier. Owens was hired by QVC in December 1994 at a salary of $55,000 per year. Domeier was hired in October 1994 at a salary of $45,000 per year. In 1995, Owen's gross income was $62,430 and Domeier's income was $55,065. In 1996, Owen's gross income was $74,013 and Domeier's gross income was $68,173.[36] However, in 1997, Domeier earned $5,000 more than Owens and, in 1998, he earned $12,000 more than Owens. Thus, for the years 1997 and 1998, Owens has satisfied her *prima facie* burden by showing that she was paid less than an employee of the opposite sex for substantially similar work.

Defendant retorts that Domeier was paid more during this time period because his performance was better than Owens' performance. Indeed, by November 1998, she was terminated because her performance was not acceptable. Thus, the defendant maintains that because Owens' performance did not warrant higher pay, any pay disparity between Owens and Do-

---

fendant may reassert its arguments by way of a motion *in limine* prior to trial.

**36.** Because Domeier was paid less than Owens in 1995, 1996 and 1997, Owens cannot claim an EPA violation for those years.

meier was based on performance rather than sex.

Owens responds by pointing to four straight years she had received positive reviews, followed by defendant's sudden insistence in 1997, that her performance had substantially deteriorated. Owens maintains that the true reason she was being rotated out was because she was being replaced by a new minority woman. Under these circumstances, the court finds that defendant's proffered reason for the pay disparity is not so clear that "no rational jury could find to the contrary." *Stanziale*, 200 F.3d at 107. Thus, defendant's motion for summary judgment as to Owens' Equal Pay Act violation claim is denied.

b. *Plaintiff Tucker's Equal Pay Act violation claim*

■ Tucker claims, and defendant does not dispute, that three of her male contemporaries were paid more than Tucker. Tucker was hired in November, 1995 at a salary of $50,000. After her probationary period, her salary was increased to $55,000 per year. There were three male show hosts hired within six months of Tucker who were paid higher salaries. Specifically, Ron Maestri was hired in February, 1996 at $60,000 per year; Victor Velez was hired in April, 1996 at $60,000 per year; and Dave King was hired in July, 1995 at $90,000 per year. Thus, Tucker has met her initial burden of showing a pay disparity for equal work.

Defendant maintains that the reasons for the pay disparity are two-fold. First, hosts Velez and King were given higher starting salaries than Tucker because these men came from a higher-paying geographical area and QVC offered a higher salary as an incentive for the move to West Chester, Pennsylvania. Second, defendant maintains that the starting salary

of these three men was greater than Tucker's because the male hosts had considerably more experience than Tucker. In support, defendant offers the declaration of Jack Comstock.

Tucker responds that defendant's argument regarding higher-paying geographical areas is not supported by statistical data, and that defendant has not provided any statistical evidence as to the average salaries in the cities which the three male hosts and Tucker moved from to become a host with QVC to support their allegation of business judgment. The court agrees. There is nothing in defendant's submission which supports its claim that geographic differences determined the level of pay. Nor does Jack Comstock's affidavit supply any statistical basis or otherwise explain the basis for the alleged geographic disparities. Furthermore, the court finds that the differences in prior professional experience between the three male hosts and Tucker are also not clear enough to show that the defendant's proffered reasons are not pretextual. The court finds that the defendant's proffered reason for the pay disparity is not so clear that "no rational jury could find to the contrary." *Id.* Thus, defendant's motion for summary judgment as to Tucker's Equal Pay Act violation claim is denied.

4. *New York statutory claims*

In Counts III and IV of the Fifth Amended Complaint, plaintiffs Velez and Tucker allege violations of New York Executive Law § 296 (New York State Human Rights Law ("NYHRL")) and Administrative Code of the City of New York § 8–107 (New York City Civil Rights Law ("NYCCRL")). In order to prevail under either statute, plaintiffs must establish that QVC committed discriminatory practices originating in New York or affecting the terms and conditions of employment

within New York. *Cf. Sherwood v. Olin Corp.,* 772 F.Supp. 1418, 1425 (S.D.N.Y. 1991) (discussing the application of the NYHRL only).

### a. *Plaintiff Velez's New York statutory claims*

The basis for plaintiff Velez's claim is that QVC's practice of discrimination in hiring, *i.e.,* token hiring, occurred in New York. Plaintiff Velez was hired by Q2, Inc., a QVC subsidiary, on September 11, 1995 as a show host on the Q2–New York program produced by Q2, Inc. Velez was employed by Q2 from September 1995 through April 1996 when Q2, Inc. was shut down. Shortly before the conclusion of Q2's operations, Jack Comstock, Vice-President of Television Sales for QVC, went to New York to interview Q2–New York program hosts, including Velez. Velez was hired in New York. Velez claims that he was hired in New York as a token and, as such, QVC practiced discrimination affecting New York.

■ However, as stated above, token hiring alone does not constitute an adverse employment action. *See supra* Part II. B.2.a. (Token hiring does not constitute intentional discrimination. However, token hiring plus channeling may under certain circumstances support a claim of disparate treatment); *cf. Cline v. Bala Nursing & Ret. Ctr.,* Civ. A. No. 97–5262, 1998 WL 136524, at *3 ("[P]laintiff must show that she suffered an adverse employment action, whether in the form of a termination or lack of promotion or otherwise, because she was [a member of a protected class]."). Rather, the act of being *hired* as a token in New York does not alone constitute an adverse employment action and cannot be the basis of a claim of discrimination occurring in New York.

### b. *Plaintiff Tucker's New York statutory claims*

■ Unlike Velez, Tucker neither worked for Q2, Inc. in New York or QVC in New York nor does she allege token hiring. Rather, Tucker simply alleged that she auditioned and was hired in New York. However, in her deposition, Tucker admits that she was not hired at the audition in New York City, but instead had a second audition in Los Angeles, California, and a final interview in West Chester, Pennsylvania. Finally, QVC called Tucker in her home in California to offer her a position.

Even if a reasonable jury were to find that Tucker auditioned and was hired in New York, Tucker makes no allegation that her hiring was in any way discriminatory. Rather, she claims that she was subjected to a hostile work environment and discrimination in salary *after* she was hired. All of these events as to which Tucker complains occurred in Pennsylvania and have no effect on New York. Thus, defendant is entitled to summary judgment on plaintiff Tucker's New York statutory claims.

### 5. *Plaintiff Tucker's fraud claim*

Plaintiff Tucker alleges that prior to the expiration of the 1999 contract (April 30, 1999), Jack Comstock scheduled a "renewal meeting" for May 11, 1999, a date after the 1999 contract had expired. Tucker claims that QVC intentionally scheduled her for an out of town assignment for the end of April 1999 in order to force a postponement of the "renewal meeting" to a date after the 1999 contract had expired. Tucker had assumed, based on the practice of prior years, that scheduling a "renewal meeting" meant that Comstock had decided to renew her contract pursuant to QVC's option to renew. This presumption was fortified by Tucker's knowledge that

she was scheduled to be on the air through June, 1999. According to Tucker, at the "renewal meeting," Comstock presented an "Amendment" to the original contract, which reduced her fixed salary by $5,000. Tucker attempted to negotiate with the assistance of a lawyer, but defendant ultimately stated that the offer was a "take it or leave it" proposition. Tucker maintains that Comstock's representation that the May 11 meeting would be a "renewal meeting" scheduled *after* the earlier contract expired constitutes a misrepresentation because the offer presented involved a contract with new terms, and it deviated from the past practice of holding "renewal meetings" during which old terms were simply extended.

▇ Pennsylvania law requires the plaintiff alleging fraud to prove the following elements by clear and convincing evidence: "(1) a misrepresentation; (2) a fraudulent utterance of it; (3) the maker's intent that the recipient be induced thereby to act; (4) the recipient's justifiable reliance on the misrepresentation; and (5) damage to the recipient proximately caused." *Trans Penn Wax Corp. v. McCandless*, 50 F.3d 217, 232 (3d Cir.1995) (quoting *Sevin v. Kelshaw*, 417 Pa.Super. 1, 611 A.2d 1232, 1236 (1992)).

▇ The court finds that plaintiff has failed to produce evidence of support to survive summary judgment for the following reasons. First, accepting the facts in the light most favorable to plaintiff Tucker, she has made no allegations that a misrepresentation was made by defendant with respect to the renewal of her contract. At no time does plaintiff allege that defendant made any promises that her contract was going to be renewed. At best, plaintiff has shown that defendant made an offer to negotiate a contract when management scheduled the renewal meeting. That Tucker was scheduled to be out

of town on assignment towards the end of the contract period does not suggest fraud, unless plaintiff could show that she had a right to an extension if the renewal meeting had been held before the expiration date of the previous contract. This she cannot do. Thus, the court finds that no reasonable jury could find by clear and convincing evidence that defendant's statements or conduct regarding the renewal meeting were misrepresentations. Rather, this fraud claim appears to be an attempt by Tucker to resurrect her breach of contract claim, which the court dismissed after determining that defendant was an at will employee who had no right to have her contract automatically renewed on the same basis. *See* Court's Order of May 4, 2002 (docket no. 30).

Secondly, Tucker has produced no evidence of intent to defraud on the part of the defendant. The *sine qua non* of fraud is deceit and plaintiff has proffered no evidence that defendant intended to deceive plaintiff in this case. That "renewal meetings" in the past had led to the execution of a new contract on the same terms plus an increase in salary, does not alone show that defendant tricked or deceived plaintiff. In this regard, plaintiff's proof is limited to her own "presumptions" and "assumptions" as to why she thought the contract would be renewed. Thus, the court finds that no reasonable jury would find by clear and convincing evidence that defendant intended to defraud plaintiff Tucker in renegotiating her contract in April/May 1999 or by failing to offer her a contract extension. Defendant is entitled to summary judgment on plaintiff Tucker's fraud claim.

### C. *Outstanding Discovery*

▇ On October 9, 2001 and October 15, 2001, plaintiffs submitted letters to the court detailing discovery that was request-

ed and to which plaintiffs claim that defendant had not responded. On May 15, 2002, construing these letters as a motion to compel documents, the court ordered the following:

> To the extent that the plaintiffs claim that a document is relevant and has been withheld without cause or claim of privilege, the withholding of any such document may be asserted as part of a Federal Rule of Civil Procedure 56(e) [37] affidavit in opposition to a motion for summary judgment. To the extent that plaintiffs wish to reassert a request for a specific document or type of document, plaintiffs may do so with specificity, that is, by reference or description to a specific document or type of documents, by June 17, 2002.

Order, May 15, 2002 (doc. no. 106). On June 17, 2002, plaintiffs' counsel submitted a letter to the court reasserting the requests for documents. The first sentence of the letter reads, "Plaintiffs' counsel, Alan J. Rich, makes the following affirmation pursuant to Federal Rule of Civil Procedure 56(e), and in following with the May 15, 2002, Order of Honorable Judge Robreno, in opposition to defendant's motions for summary judgment." Federal Rule of Civil Procedure 56(f) provides:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f). The Third Circuit has interpreted this Rule to require the party seeking to avoid summary judgment to "submit an *affidavit* specifying, for example, what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained." *Dowling v. City of Philadelphia*, 855 F.2d 136, 139–40 (3d Cir.1988) (emphasis added).

Plaintiffs' counsel failed to comply with the requirements of Federal Rule of Civil Procedure 56(f). First, the June 17, 2002 letter, which claims to be an "affirmation" is not an affidavit.[38] Second, assuming that an "affirmation" could be construed as an affidavit or an unsworn verification, the June 17, 2002 letter does not comport with the requirements of Rule 56(f). Although plaintiffs have identified some of the categories of discovery that they seek, they have failed to show how this discovery would be relevant to any of the issues presented in the defendant's motions for summary judgment, or to give any valid excuse for not obtaining this information during the discovery taken in this case. *See Hancock Indus. v. Schaeffer*, 811 F.2d 225, 229–30 (3d Cir.1987) (Rule 56(f) motion, even if treated as an affidavit, insufficient because it failed to explain need for discovery and did not identify particular facts hoped to be uncovered); *Koplove v. Ford Motor Co.*, 795 F.2d 15, 18 (3d Cir. 1986) (Rule 56(f) affidavit insufficient because it did not specify what discovery was needed or why it had not previously been secured). Thus, plaintiffs have failed to show that obtaining further discovery would preclude summary judgment on any of their claims.

---

**37.** Citation to this subsection is in error. The correct provision is Rule 56(f) of the Federal Rules of Civil Procedure.

**38.** Plaintiff does not contend that this letter constitutes an unsworn verification pursuant to 28 U.S.C. § 1746.

Finally, it is not unfair to deny further discovery in this case. While presiding over the litigation, the court has held several hearings during which it has become familiar with the breadth and depth of the discovery obtained by plaintiffs in this litigation. Over the past five years, while in litigation at the EEOC, in the district court in New York, and in this court, plaintiffs have propounded, and the defendant has responded (albeit after some reluctance) to numerous discovery requests. Moreover, plaintiffs have been allowed to amend their complaint on five occasions. It is now plain that plaintiffs have had a full and fair opportunity to develop their claims. Based on this record, the court concludes that the summary judgment motions are ripe for disposition and that plaintiffs efforts to extend the discovery period are unavailing.

## III. CONCLUSION

For the foregoing reasons, summary judgment will be granted on all of plaintiffs Clarence Reynolds, Sophia Minott–Talley, and Daliza Ramirez–Crane's claims, because the claims are time-barred. Summary judgment is also granted as to plaintiff Victor Velez's Title VII, Section 1981 and PHRA claims based on token hiring and retaliation, and New York State Human Rights Law and New York City Civil Rights Law claims. Summary judgment will be granted as to plaintiff Gwen Owens' Title VII, Section 1981, and PHRA claims based on token hiring. Finally, summary judgment will be granted as to plaintiff Lynne Tucker's Title VII and PHRA claims based on retaliation, and her state law fraud claim will be dismissed.

The following claims will proceed to trial: Victor Velez's Title VII, Section 1981 and PHRA claims based on hostile work environment, disparate treatment and discriminatory termination; Gwen Owens' Title VII, Section 1981 and PHRA claims based on hostile work environment, retaliation, disparate treatment, and termination, and Equal Pay Act violation claim; and Lynne Tucker's hostile work environment and Equal Pay Act violation claim.

An appropriate order follows.

### *ORDER*

**AND NOW,** this 27th day of **September, 2002,** upon consideration of defendants motions for summary judgment and pursuant to the court's memorandum dated September 27th, 2002, it is hereby **ORDERED** that:

1. Defendant's Motion for Summary Judgment with respect to the Claims Asserted by Plaintiff Clarence Reynolds (doc. no. 71) is **GRANTED;**

2. Defendant's Motion for Summary Judgment with respect to the Claims Asserted by Plaintiff Sophia Minott–Talley (doc. no. 75) is **GRANTED;**

4. Defendant's Motion for Summary Judgment with respect to the Claims Asserted by Plaintiff Daliza Ramirez–Crane (doc. no. 77) is **GRANTED;**

5. Defendant's Motion for Summary Judgment with respect to the Claims Asserted by Plaintiff Victor Velez (doc. no. 73) is **GRANTED IN PART** and **DENIED IN PART;**

6. Defendant's Motion for Summary Judgment with respect to the Claims Asserted by Plaintiff Gwendolyn Owens (doc. no. 79) is **GRANTED IN PART** and **DENIED IN PART;**

6. Defendant's Motion for Summary Judgment with respect to the Claims Asserted by Plaintiff Lynne Tucker (doc. no. 81) is **GRANTED IN PART** and **DENIED IN PART.**

**AND IT IS SO ORDERED.**

## ORDER

AND NOW, this 27th of **September, 2002**, that defendant's motion to exclude a taped recording of a conversation between Victor Velez and Jack Comstock is hereby **DENIED without prejudice.**

**AND IT IS SO ORDERED.**